**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

Patricia A. Decorpo

    v.                              Civil No. 13-cv-484-LM
                                              Opinion No. 2014 DNH 203

Unum Life Insurance Company
of America

**O R D E R**

The Plaintiff, Patricia A. Decorpo ("Decorpo"), has brought this action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq., to challenge a decision by the Defendant, Unum Life Insurance Company of America ("Unum"), to terminate her long-term disability benefits.  Unum has filed a counterclaim seeking the return of some $7,200 that it suggests was overpaid to Decorpo.  Both parties have moved for judgment on the administrative record. For the reasons that follow, Decorpo's Motion for Judgment on the Record is DENIED and Unum's Motion for Judgment on the Administrative Record is GRANTED.  Nevertheless, the court finds that Unum is entitled to recover only a portion of the overpayment.

**Legal Standard**

In ERISA cases, courts are called upon to "evaluate the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary." Leahy v. Raytheon Co., 315 F.3d 11, 18 (1st Cir. 2002). Thus, this court sits more as an "appellate tribunal than as a trial court." Id. Where, as here, the ERISA plan "gives the plan administrator discretionary authority to interpret the terms of the plan and to determine a claimant's eligibility for benefits, [courts] will uphold the decision unless it is arbitrary, capricious, or an abuse of discretion." Tsoulas v. Liberty Life Assurance Co. of Bos., 454 F.3d 69, 76 (1st Cir. 2006). Thus, a plan administrator's decision "must be upheld if there is any reasonable basis for it." Madera v. Marsh USA, Inc., 426 F.3d 56, 64 (1st Cir. 2005).

But, "[t]his deferential standard of review . . . is not entirely without teeth – it requires that a determination by a plan administrator 'must be reasoned and supported by substantial evidence.'" Ortega-Candelaria v. Johnson & Johnson, 755 F.3d 13, 20 (1st Cir. 2014) (quoting Colby v. Union Sec. Ins. Co. & Mgmt. Co. for Merrimack Anesthesia Assocs. Long Term Disability Plan, 705 F.3d 58, 62 (1st Cir. 2013)). Evidence is deemed substantial when it is "reasonably sufficient to support

2

a conclusion." Cusson v. Liberty Life Assurance Co. of Bos., 592 F.3d 215, 230 (1st Cir. 2010) (quoting Wright v. R.R. Donnelley & Sons Co. Grp. Benefits Plan, 402 F.3d 67, 74 (1st Cir. 2005)). Ultimately, the question for a reviewing court is whether the plan administrator "had substantial evidentiary grounds for a reasonable decision in its favor." Ortega-Candelaria, 755 F.3d at 20 (quoting Matías-Correa v. Pfizer, Inc., 345 F.3d 7, 12 (1st Cir. 2003)).

## Factual Background[1]

Decorpo, currently 52 years old, was employed as a legal secretary with the New Hampshire Public Defender (the "NHPD") from October 2002 to August 2010. Joint Statement of Material Facts ("JSMF") (Document. No. 10) ¶¶ 1-2. During that time, the NHPD offered a disability benefits policy, administered by Unum, to its employees (the "Policy"). Id. ¶ 3. Under the terms of the Policy, Unum was solely responsible both for making coverage

---

[1] The Administrative Record in this case totals some 1680 pages. The parties submitted a Joint Statement of Material Facts that cites to and summarizes the Administrative Record. Citations in this Order are to the Joint Statement of Material Facts, though the court has also reviewed the Administrative Record in its entirety.

eligibility determinations and for making payments to insureds.
Id. ¶ 6.

    A.   The Policy

    Several of the Policy's provisions are at issue.  First,
the Policy provides that "[y]ou are disabled when Unum
determines that: you are limited from performing the material
and substantial duties of your regular occupation due to your
sickness or injury; and you have a 20% or more loss in your
indexed monthly earnings due to the same sickness or injury."
Id. ¶ 7.  However, after an insured has received benefits for 24
months, the definition of disability changes: "[a]fter 24 months
of payments, you are disabled when Unum determines that due to
the same sickness or injury, you are unable to perform the
duties of any gainful occupation for which you are reasonably
fitted by education, training or experience."  Id.

    The Policy provides further that "[t]he lifetime cumulative
maximum benefit period for all . . . disabilities based
primarily on self-reported symptoms is 24 months."  Id. ¶ 12.
The term "self-reported symptoms" is defined to mean
"manifestations of your condition which you tell your physician,
that are not verifiable using tests, procedures or clinical

examinations standardly accepted in the practice of medicine."
Id. ¶ 14.  Such symptoms "include, but are not limited to
headaches, pain, fatigue, stiffness, soreness, ringing in ears,
dizziness, numbness and loss of energy."  Id.

Finally, of relevance to Unum's counterclaim, the Policy
provides that if an individual is found to be disabled, he or
she is entitled to 60% of monthly earnings, less "any deductible
sources of income."  Id. ¶ 9.  Deductible sources of income
include payments made to the insured pursuant to the Social
Security Act.  Id.  Under the terms of the Policy, Unum "has the
right to recover overpayments due to . . . [a policy holder's]
receipt of deductible sources of income."  Id. ¶ 11.

B.   Decorpo's Ailments

Decorpo suffers from myriad ailments, including chronic
pain and fatigue, fibromyalgia,[2] Sjögren's syndrome,[3] vestibular

---

[2] Fibromyalgia is "a common syndrome of chronic widespread
soft-tissue pain accompanied by weakness, fatigue, and sleep
disturbances; the cause is unknown."  Stedman's Medical
Dictionary 725 (28th ed. 2006).

[3] Sjögren's is an autoimmune disorder that can result in dry
mouth, joint pain, swelling and stiffness.  The Mayo Clinic,
Sjögren's syndrome, http://www.mayoclinic.org/diseases-
conditions/sjogrens-syndrome/basics/symptoms/con-20020275 (last
visited Sept. 23, 2014).

neuritis,[4] asthma, cervical dystonia,[5] Raynaud's disease,[6] Lyme disease, depression and Morton's neuroma.[7]  Id. ¶ 133.

C.    Decorpo's Dealings with Unum

In September 2010, shortly after ceasing her employment with the NHPD, Decorpo submitted a long-term disability claim to Unum.  In her claim, Decorpo described her ailments as including Sjögren's syndrome, fibromyalgia and chronic fatigue.  Id. ¶ 19. Decorpo's claim was accompanied by a statement given by her rheumatologist, Dr. Angelica Gonzalez, who had been treating Decorpo since 2003.  Id. ¶ 20.

_____

[4] Vestibular neuritis is a disorder that results in the disruption of sensory information from the ear to the brain, potentially resulting in vertigo, dizziness and difficulty with balance, vision and hearing.  Vestibular Disorders Association, Infections of the Inner Ear, http://vestibular.org/labyrinthitis -and-vestibular-neuritis (last visited Sept. 23, 2014).

[5] Cervical dystonia is characterized by involuntary and often painful muscle contractions in the neck area.  The Dystonia Society, About Dystonia, http://www.dystonia.org.uk/ index.php/professional-research/types-of-dystonia/cervical- dystonia (last visited Sept. 23, 2014).

[6] Raynaud's disease causes the extremities to feel numb and cool in response to cold temperatures or stress and can result in pain.  The Mayo Clinic, Raynaud's disease, http://www. mayoclinic.org/diseases-conditions/raynaudsdisease/basics/ definition/con-20022916 (last visited Sept. 23, 2014).

[7] Morton's neuroma involves a thickening of the tissue around one of the nerves leading to the toes and causes foot pain.  The Mayo Clinic, Morton's neuroma, http://www.mayoclinic. org/diseases-conditions/mortons-neuroma/basics/definition/con- 20026482 (last visited Sept. 23, 2014).

Unum began a review to assess Decorpo's eligibility to receive benefits under the Policy.  As part of this process, Unum solicited information from the NHPD regarding Decorpo's duties and from Dr. Gonzalez regarding Decorpo's treatment and prognosis.  Id. ¶¶ 23, 28.  Unum also sought information from Dr. Andrew Sebastyn, Decorpo's family physician.  Id. ¶ 31.

Both Dr. Gonzalez and Dr. Sebastyn responded to Unum's request for information, and both opined that Decorpo was unable to work as a result of her diagnoses of fibromyalgia and Sjögren's syndrome.  Id. ¶¶ 33-34.  With this information in hand, Unum convened a "roundtable" discussion, involving a clinical consultant, an on-site physician, a vocational consultant and a Unum quality control consultant, and determined that Decorpo was eligible for a monthly benefit payment of $1,902.23.  Id. ¶¶ 36, 38-39.  Unum notified Decorpo of its decision by letter in January 2011, and outlined for Decorpo the Policy's requirement that any benefits be offset by other deductible sources of income.  Id. ¶ 39.  Although the letter was sent in January 2011, it appears that Decorpo's benefits were retroactive to November 17, 2010.  Id. ¶ 110.

The record suggests that Unum continued to closely monitor Decorpo's eligibility for benefits.  For example, another roundtable discussion was held in February 2011, and a Unum

7

representative initiated a phone call with Decorpo during the following month to discuss her recent symptoms.  Id. ¶¶ 44, 46.  Additionally, Unum continued to request information from Decorpo's various medical providers.[8]  Id. ¶¶ 47, 61, 79.

During the summer of 2012, as Decorpo was approaching 24 months of payments, Unum undertook a "change in definition" investigation to determine whether Decorpo would qualify for benefits beyond the initial 24-month period.  Id. ¶ 80.  As part of this process, Unum again sought updates from Dr. Gonzalez and Dr. Sebastyn.  Id. ¶ 81.  In response, Dr. Sebastyn affirmed his belief that Decorpo was unable to work.  Id. ¶ 82.  Dr. Gonzalez disagreed, however, concluding that "Decorpo did have the ability to perform her occupation" if she was able to take "occasional breaks."  Id. ¶ 84.

Unum referred Decorpo's case file to Dr. Peter Kouros, an on-site physician employed by Unum.  Id. ¶ 93.  Dr. Kouros assessed each of Decorpo's reported ailments and, with respect to each, concluded that there was no objective, physical evidence in the record to suggest that Decorpo was incapable of performing her occupational tasks.  Id.

---

[8] The record suggests that during this time, in May 2011, Decorpo was hospitalized for four days for pain symptoms related to cervical dystonia and Sjögren's syndrome.  JSMF ¶¶ 72-74.

Dr. Kouros promptly referred the file to another in-house Unum physician, Dr. Joseph Sentef.  Id. ¶ 98.  Dr. Sentef completed a lengthy written summary of his findings, and concluded that "physical exams have revealed no neurological deficits. . . . Looking at all the claimant's diagnoses, both individually and collectively . . . I concur that the claimant would indeed be able to perform a sedentary occupation . . . ." Id. ¶ 100.

In sum, Dr. Kouros and Dr. Sentef both reached the conclusion that Decorpo's impairment was the result of self-reported symptoms of pain and fatigue, but that her disability had not been documented by objective medical evidence or testing.  On December 5, 2012, Unum sent Decorpo a letter informing her that she was no longer eligible to receive benefits.  Id. ¶ 108.  The letter stated Unum's position that because Decorpo's symptoms were self-reported, she could not collect benefits beyond the initial 24-month period.  Id.

Importantly, as it relates to Unum's counterclaim, the December 5 letter informed Decorpo that although her benefits would terminate as of November 17, 2012 (precisely 24 months after the payments began in November 2010), Unum would be making an additional, one-time payment to Decorpo of $5,706.69 as a

"customer service."  Id.  This sum represented three months'
worth of additional payments (3 months x $1,902.23 = $5,706.69).

In January 2013, Decorpo appealed Unum's decision.  Id. ¶
112.  In support of her appeal, Decorpo submitted letters and
medical records from Dr. Gonzalez and Dr. Sebastyn, both of whom
opined that Decorpo was unable to work as a result of her
ailments.  Id. ¶¶ 114-15, 118.

In March 2013, in the midst of Unum's review of Decorpo's
appeal, Unum received word from the Social Security
Administration that Decorpo had been found to be disabled and
was eligible for Social Security benefits.  Id. ¶ 121.  This
award was retroactive to August 2012 and would be paid as a
monthly sum of $1,103.70.  Id. ¶ 127.

Unum's review of Decorpo's appeal consisted of an
assessment of Decorpo's case file by Susan Grover, a Unum-
employed registered nurse ("RN Grover"), and Dr. Christopher
Bartlett, a Unum-employed physician.  Id. ¶¶ 132-33.  Both RN
Grover and Dr. Bartlett concluded that, excluding Decorpo's
self-reported symptoms, there was insufficient evidence to
support a finding that Decorpo could not satisfy the
requirements of sedentary employment.  Id.  Based largely on
these conclusions, Unum denied Decorpo's appeal in a letter
dated May 28, 2013.  Id. ¶ 136.

Decorpo brought suit in Hillsborough Superior Court in
September 2013, and Unum removed the action to this court.

### D.   Self-Reported Versus Objective Ailments

It is beyond dispute that Decorpo suffers from a litany of
ailments which, individually and collectively, adversely affect
her quality of life.  Nevertheless, the plain language of the
Policy limits coverage for "disabilities based primarily on
self-reported symptoms" to 24 months.  Id. ¶ 12.  And, it was on
this provision that Unum based its decision to terminate
Decorpo's benefits.  Thus, as this court must "evaluate the
reasonableness of [Unum's] administrative determination," Leahy,
315 F.3d at 18, an assessment of the medical evidence available
to Unum at the time of its determination is a necessary first
step.

The court has carefully reviewed the record and has
identified the points at which one or more of Decorpo's
diagnoses were supported by objective medical evidence or
testing (rather than self-reported symptoms of pain and
fatigue).  Those points appear to be as follows:

- In May 2011, Unum sought information from Dr.
  Jeffrey Byer, another of Decorpo's treating
  physicians.  Dr. Byer provided notes from office
  visits with Decorpo which show that an ultrasound
  had detected a nodule on Decorpo's left thyroid
  gland, and that a CT scan had suggested probable

early stage Sjögren's syndrome.  JSMF ¶ 48.  The
diagnosis of early stage Sjögren's syndrome was
later confirmed in a separate CT scan performed by
Dr. Pallavi Guddeti.  <u>Id.</u> ¶ 67.

- Notes from an April 2011 office visit provided by
  Dr. Sebastyn show that Decorpo presented with pain
  resulting from a lump on her right foot, which was
  diagnosed as Morton's neuroma.  <u>Id.</u> ¶ 50.

- Notes from a January 2012 office visit provided by
  Dr. Sebastyn indicate that Decorpo was tender in 18
  of 18 pressure points commonly used to diagnose and
  evaluate fibromyalgia.  <u>Id.</u> ¶ 76.

- Notes from a May 2012 office visit provided by Dr.
  Sebastyn indicate that an MRI of the spine showed
  "degenerative spondylosis at C5-6 with some loss of
  disc signal intensity . . . ."[9]  <u>Id.</u> ¶ 83.

- Medical records provided with Decorpo's appeal
  indicate that she tested positive for Lyme disease
  in 2008.  <u>Id.</u> ¶ 112.

- Notes from a neurological examination in February
  2013, provided by Dr. Sebastyn, indicate that
  Decorpo's cerebellar tests were "abnormal" and that
  her balance was impaired.  <u>Id.</u> ¶ 119.

- Finally, the record contains a report by Dr. Jack
  Bueno, who treated Decorpo in January 2013 for an
  episode of rectal bleeding.  <u>Id.</u> ¶ 124.

---

[9] Spondylosis is used to describe any manner of spinal
degeneration.  Spine Health, <u>Spondylosis</u>, http://www.spine-
health.com/conditions/lower-back-pain/spondylosis-what-it-
actually-means (last visited Sept. 24, 2014).

**Discussion**

A.    The Reasonableness of Unum's Determination

In ERISA cases, the burden to prove an entitlement to benefits rests squarely with the plaintiff.  See Orndorf v. Paul Revere Life Ins. Co., 404 F.3d 510, 518-19 (1st Cir. 2005). Thus, it is Decorpo's burden to demonstrate: (1) that she is disabled; and (2) that her disability is not "based primarily on self-reported symptoms."  JSMF ¶ 12.  Logically, then, the court need only consider those seven objectively identified ailments listed above, because any additional self-reported symptoms that Decorpo may have experienced would not entitle her to benefits.

i.    The Policy Requires that the Insured's Sickness
or Injury Be Disabling

The Policy provides that "[y]ou are disabled when Unum determines that . . . you are limited from performing the material and substantial duties of your regular occupation due to sickness or injury. . . . After 24 months of payments, you are disabled when Unum determines that due to the same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience."  Id. ¶ 8 (emphasis added).  Thus, the Policy plainly imposes a requirement that the sickness or injury complained of must render the insured disabled.

13

As an initial matter, all but one of the objectively verified ailments set forth above may be set aside because there is no evidence in the record that would support a conclusion that, individually or collectively, they render Decorpo disabled.  For example, nowhere in the record is there evidence that the nodule detected on Decorpo's thyroid gland would have had a debilitating effect.  Likewise, while Decorpo was diagnosed with Morton's neuroma in 2011, the record suggests that she later underwent surgery to resolve this issue, and there is no evidence that the disorder would render her unable to perform sedentary tasks.  See id. ¶ 87.

What is more, the office visit notes from Dr. Sebastyn summarizing the MRI which showed degenerative spondylosis state further that "there is no deformity or compression of the spinal column" and that the MRI was otherwise unremarkable.  Id. ¶ 83. In any event, nowhere in the record is there a suggestion that Decorpo's symptoms are a result of degenerative spondylosis, or that the disorder would render her unable to work.  Further, while the record reflects that Decorpo tested positive for Lyme disease in 2008 and had an isolated occurrence of rectal bleeding in 2013, there is no evidence to suggest that either of these were ongoing issues rendering Decorpo disabled.

14

With regard to the CT scans suggesting early stage Sjögren's syndrome, the first of these scans was performed by Dr. Byer, whose office visit notes merely indicate that the findings "appear to be most compatible with probable stage 1 Sjögren syndrome." Id. ¶ 48. Decorpo underwent a separate CT scan performed by Dr. Guddeti, who noted in his office visit notes that the "CT did confirm the presence of innumerable small cystic lesions in both of her parotids – most compatible with probably stage 1 Sjögren [s]yndrome."[10] Id. ¶ 67. At multiple points, the record suggests that Decorpo suffered from dry eyes as a result of her affliction with Sjögren's syndrome. See id. ¶¶ 71, 79. Nowhere, however, is there evidence to support the conclusion that Decorpo's Sjögren's syndrome and its resulting symptom of dry eyes would render her unable to perform sedentary tasks.

Finally, Dr. Sebastyn's notes from an office visit in February 2013 indicate that Decorpo underwent an "abnormal" neurological examination. In those notes, Dr. Sebastyn indicated that "[a]ll cerebellar tests [were] abnormal . . . as soon as patient closes her eyes . . . [s]he becomes very tremulous and feels as though she is about to fall." Id. ¶ 119.

---

[10] The parotid glands are salivary glands. Stedman's, supra note 2, at 1426.

Presumably, though not expressly stated, these findings relate to Decorpo's affliction with vestibular neuritis, which can result in impaired balance.  Despite scouring the record, however, the court has been unable to find (and Decorpo does not cite) any connection between these indicators of impaired balance and an inability to perform sedentary employment tasks.

Unum considered all of these ailments in assessing Decorpo's eligibility for benefits.  Four Unum-employed medical professionals – Dr. Kouros, Dr. Sentef, Dr. Bartlett and RN Grover, concluded that there was insufficient evidence to suggest that these ailments would have rendered Decorpo disabled.  Id. ¶¶ 93, 98, 132, 133.  And, this position was explained to Decorpo in Unum's letter of December 5, 2012, which informed Decorpo that she was no longer eligible for benefits.  Id. ¶¶ 108-09.  Given the court's own inability to uncover evidence in the record that these ailments rendered Decorpo disabled, it simply cannot be said that Unum's determination was arbitrary, capricious, or an abuse of discretion.[11]  Tsoulas, 454

---

[11] In contending that Unum's termination of her benefits was arbitrary and capricious, Decorpo relies principally on Quinlisk v. Unum Life Ins. Co. of Am., C.A. No. 07-40292-FDS, 2009 U.S. Dist. LEXIS 127197 (D. Mass. Sept. 29, 2009).  This reliance is misplaced.  There, the district court remanded a long-term disability benefits dispute to the insurer for further proceedings, but did so only after determining that the insurer's in-house doctors had misread and misinterpreted

F.3d at 76.  Thus, the court is powerless to intervene.  See
Madera, 426 F.3d at 64 (requiring that the administrator's
decision be upheld if "there is any reasonable basis for it").

ii.  Decorpo's Fibromyalgia Disability is Based
     Primarily on Self-Reported Symptoms

As noted, the Policy plainly limits coverage for
"disabilities based primarily on self-reported symptoms" to 24
months.  JSMF ¶ 12.  And, "self-reported symptoms" are defined
to include pain and fatigue.  Id. ¶ 14.  Of the seven
objectively verified ailments and symptoms set forth above, the
court is left with only the 18-pressure point test for
fibromyalgia administered by Dr. Sebastyn.

Unum appears to concede that Decorpo's fibromyalgia and its
resulting pain and fatigue render her disabled.  In Unum's
December 5, 2012 letter to Decorpo terminating her benefits,
Unum wrote that "[b]ecause your disability is due, in part, to
the symptoms associated with your condition of fibromyalgia,
including pain and fatigue, your claim is subject to [the 24-
month] limitation."  Id. ¶ 108.  However, Unum takes the
position that Decorpo's fibromyalgia is based primarily on self-
reported symptoms.

---

crucial portions of the plaintiff's medical records.  Id. at
*26-27.  Here, there is no suggestion that Unum personnel made
similar errors.

Courts have long recognized that disability claims based on fibromyalgia present difficult issues.  See Sarchet v. Chater, 78 F.3d 305, 306 (7th Cir. 1996) (Posner, C.J.) (describing fibromyalgia as an "elusive and mysterious disease" and noting that its "causes are unknown, there is no cure, and . . . its symptoms are entirely subjective").  Nevertheless, some courts have endorsed the use of an 18-point "trigger" test, in which a physician presses different points on the body and gauges the patient's reaction; a flinch indicates pain in the area, and pain in 11 of the 18 points is a positive indicator for fibromyalgia.  See, e.g., Hawkins v. First Union Corp. Long-Term Disability Plan, 326 F.3d 914, 919 (7th Cir. 2003) ("[Fibromyalgia] can be diagnosed more or less objectively by the 18-point test . . . ."); Russell v. UNUM Life Ins. Co. of Am., 40 F. Supp. 2d 747, 751 (D.S.C. 1999) (describing the 18-point test as an "objective factor[] to diagnose fibromyalgia").

The First Circuit, too, has seemingly endorsed the use of the 18-point test for fibromyalgia as an objective evaluative tool.  See Johnson v. Astrue, 597 F.3d 409, 412 (1st Cir. 2009) (per curiam) ("[S]ince trigger points are the only 'objective' signs of fibromyalgia . . . .").  Nevertheless, the First Circuit has repeatedly distinguished between an objective diagnosis of fibromyalgia, and objective proof that the

plaintiff's fibromyalgia prevents him or her from working.  See
Denmark v. Liberty Life Assurance Co. of Bos., 481 F.3d 16, 37
(1st Cir. 2007), vacated on other grounds, 566 F.3d 1 (1st Cir.
2009); Boardman v. The Prudential Ins. Co. of Am., 337 F.3d 9,
16-17 (1st Cir. 2003); Cook v. Liberty Life Assurance Co. of
Bos., 320 F.3d 11, 21 (1st Cir. 2003).

In Cook, the First Circuit ruled that the defendant insurer
had acted unreasonably when it required that the plaintiff
provide objective proof of her diagnoses of fibromyalgia and
chronic fatigue.  See 320 F.3d at 21.  The Circuit reasoned that
because these ailments could not be diagnosed by a laboratory
test, it was "not reasonable for [the insurer] to expect [the
plaintiff] to provide convincing clinical objective evidence
. . . ."  Id. (citations omitted) (internal quotation marks
omitted).

Boardman was decided shortly after Cook.  There, as here,
the plaintiff suffered from a "large constellation of problems"
that manifested primarily as pain and fatigue.  Boardman, 337
F.3d at 12.  The defendant insurer terminated the plaintiff's
disability benefits on grounds that the plaintiff had not
presented objective evidence that her disability rendered her
unable to perform her occupation.  Id. at 16-17.  The First
Circuit began by noting that, like the situation in Cook, it

19

would have been unreasonable for the insurer to require
objective evidence of the plaintiff's diagnoses.  Id. at 17 n.5.
However, the Circuit drew a distinction between the
unreasonableness of an insurer's insistence on objective
evidence of a diagnosis, and objective evidence of the
disability's limiting effects.  Id. ("While the diagnoses of
chronic fatigue syndrome and fibromyalgia may not lend
themselves to objective clinical findings, the physical
limitations imposed by the symptoms of such illnesses do lend
themselves to objective analysis.").

Later, in Denmark, the First Circuit echoed its holding in
Boardman, noting that "this court draws a distinction between
requiring objective evidence of the diagnosis, which is
impermissible for a condition such as fibromyalgia . . . and
requiring objective evidence that the plaintiff is unable to
work, which is allowed." 481 F.3d at 37.  There, the Circuit
ruled that "it fell within the parameters defined in Boardman
for [the defendant insurer] to require [the plaintiff] to
provide objective evidence of functional limitations or
restrictions that would prevent her from working."  Id.

Here, Unum has not taken the position that Decorpo is not
disabled.  Rather, Unum's decision to discontinue benefits

followed its determination that Decorpo's disability was based primarily on self-reported symptoms.

Unum's conclusion was "reasoned and supported by substantial evidence."[12]  See Ortega-Candelaria, 755 F.3d at 20. While the 18-point trigger test may provide some level of objectivity in diagnosing and assessing fibromyalgia, the test necessarily relies on the patient's self-reporting.  What is more, even once a diagnosis of fibromyalgia is rendered, Unum is entitled to insist on objective evidence that the fibromyalgia renders Decorpo unable to work.  There is ample such evidence in the record, but it all involves Decorpo's symptoms of pain and fatigue – both of which are expressly included in the Policy's definition of "self-reported symptoms."  JSMF ¶ 14.  In sum, there is substantial basis for Unum's conclusion that Decorpo's

---

[12] Decorpo suggests that the self-reported symptoms provision of the Policy is vague and ambiguous, and thus must be construed against Unum.  See Phillips v. Lincoln Nat. Life Ins. Co., 978 F.2d 302, 308 (7th Cir. 1992) ("Ambiguous terms in an insurance contract will be strictly construed in favor of the insured.").  Specifically, Decorpo notes that the Policy does not expressly name fibromyalgia as a disability subject to the self-reported symptoms provision.  There is no ambiguity here. The Policy clearly defines "self-reported symptoms" to mean "the manifestations of your condition which you tell your physician, that are not verifiable using tests, procedures or clinical examinations standardly accepted in the practice of medicine" and provides specific examples including pain and fatigue.  JSMF ¶ 14.  That the Policy does not name the specific ailments that would fall into this category does not result in ambiguity or vagueness.

disability is based primarily on self-reported symptoms, and
thus the court must uphold it.  See Madera, 426 F.3d at 64.

    B.   Unum's Right to Recover Overpayments

    The Policy entitles Unum to "recover overpayments due to
. . . [a policy holder's] receipt of deductible sources of
income," which include Social Security payments.  JSMF ¶¶ 9, 11.
Decorpo received benefits under the Policy in the amount of
$1,902.23 per month for a 24-month period from November 17, 2010
to November 16, 2012.  Id. ¶¶ 39, 110.  Plus, Unum paid Decorpo
three months' worth of benefits in December 2012 as a "customer
service" when Unum wrote to Decorpo informing her that her
benefits would be discontinued.  Id. ¶ 109.

    Decorpo began receiving Social Security payments of
$1,103.70 per month in August 2012.  Thus, it appears that
Decorpo received both Social Security payments and benefits
under the Policy from August 1, 2012, until November 16, 2012, a
period of 3.53 months (given that Decorpo received benefits for
16 of 30 days in November).

    Unum now seeks $7,206.27 that it contends was overpaid to
Decorpo.  Though not immediately clear, Unum seems to arrive at
this number by roughly multiplying the 3.53 months by Decorpo's
monthly Social Security payment, then adding an additional three

22

months' worth of Social Security payments to account for the three months' "customer service" payment:

(3.53 months x $1,103.70) + (3 months x $1,103.70) = $7,207.16

Unum is not entitled to repayment of any funds paid to Decorpo as a "customer service."  Nowhere in Unum's December 2012 letter did Unum note that this one-time payment was subject to deductible sources of income, and Unum may not now seek retroactive garnishment.  Instead, Decorpo must repay $3,896.06, representing the 3.53 months that she received both Social Security payments and benefits under the policy.

### Conclusion

While the court has no doubt that Decorpo suffers from a variety of ailments, the plain terms of the Policy limit Decorpo's eligibility for benefits to 24 months because her disability of fibromyalgia is based primarily on self-reported symptoms, and because there is insufficient evidence to conclude that her remaining ailments render her unable to work.  On this record, Unum's Motion for Judgment on the Administrative Record (Document No. 12) must be granted and Decorpo's Motion for Judgment on the Record (Document No. 11) must be denied.  And, for the reasons given, Decorpo is directed to make payment to

Unum in the amount of $3,896.06, which represents the full extent of her liability for overpayment.

The clerk of court shall enter judgment accordingly and close the case.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

September 25, 2014

cc:   Byrne J. Decker, Esq.
      Robert M. Shepard, Esq.
      Tanya L. Spony, Esq.